IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Macila V. James, | ) | |
| | ) | Civil Action No. 6:13-1078-RMG-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

    This case is before the court for a report and recommendation pursuant to

Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

    The plaintiff, who is proceeding *pro se*, brought this action pursuant to Section

205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review

of a final decision of the Commissioner of Social Security denying her claim for disability

insurance benefits under Title II of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

    The plaintiff filed an application for disability insurance benefits ("DIB") on

October 30, 2009, alleging that she became unable to work on December 31, 2002.  The

application was denied initially and on reconsideration by the Social Security Administration.

On July 9, 2010, the plaintiff requested a hearing.  The administrative law judge ("ALJ"),

before whom the plaintiff, who was represented by legal counsel at the time, and Joel D.

---

  [1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

  [2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Leonard, an impartial vocational expert, appeared on May 5, 2011, considered the case *de novo* and, on November 10, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 7, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant last met the insured status requirements of the Social Security Act through December 31, 2006.
>
> (2)    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 31, 2002, through her date last insured of December 31, 2006 (20 C.F.R § 404.1571 *et seq*).
>
> (3)    Through the date last insured, the claimant had the following severe impairments:  sarcoidosis, asthma, and anemia (20 C.F.R. § 404.1520(c)).
>
> (4)    Through the date last insured. the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with restrictions as noted hereafter. She can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can occasionally stoop, crouch, kneel, crawl, balance, and/or climb stairs or ramps. She cannot climb ladders, ropes, or scaffolds.  She requires a work environment with no concentrated exposure to dust, fumes, gases, odors, mold, and extremes of humidity and temperature secondary to her respiratory impairments.
>
> (6)    Through the date last insured, the claimant was capable of performing past relevant semi-skilled work with sedentary to light exertional demands including work as a secretary

[Dictionay of Occupational Titles Number (DOT #) 201.362-030], a supervisor of cashiers [DOT #211.137-010], an inventory/invoice control worker [DOT #214.362-026], a sales associate [DOT #261.357-050], customer service clerk [DOT #299.367-010], and store manager [DOT #185.167-046]. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7)    The claimant was not been under a disability, as defined in the Social Security Act, at any time from December 31, 2002, the alleged onset date, through December 31, 2006, the date last insured (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing

substantial gainful employment.   20 C.F.R. § 404.1520.   If an individual is found not

disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past

relevant work as it is customarily performed in the economy or as the claimant actually

performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He

must make a prima facie showing of disability by showing he is unable to return to his past

relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant

work, the burden is on the Commissioner to come forward with evidence that the plaintiff

can perform alternative work and that such work exists in the regional economy.   The

Commissioner may carry the burden of demonstrating the existence of jobs available in the

national economy that the plaintiff can perform despite the existence of impairments that

prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly

tailored to determine whether the findings of the Commissioner are supported by substantial

evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

(4th Cir. 1990).   Consequently, the Act precludes a *de novo* review of the evidence and

requires the court to uphold the Commissioner's decision as long as it is supported by

substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith

v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).   The phrase "supported by substantial

evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance.  If there is evidence to justify a refusal to direct
> a  verdict were the case before a jury, then there is "substantial
> evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff had a check up at the Womack Army Center on March 12, 2002.[3] The doctor noted the plaintiff's history of sarcoidosis,[4] which was reportedly stable. The examination was normal except the doctor observed a "mild" wheeze (Tr. 739).

The plaintiff was also treated by Ipbi Kim, M.D., from April 16, 2002, through September 23, 2003 (Tr. 227-32). In September 2003, Dr. Kim noted that a sinus surgery was performed in January 2001 to remove seven sarcoid cysts from the plaintiff's left maxillary sinus. Dr. Kim also discussed the plaintiff's history of nasal symptoms, which reportedly began in 1989, and included nasal congestion, sneezing spells, and an itchy nose and throat. The plaintiff told Dr. Kim that her asthma symptoms occurred periodically, and she used a Proventil inhaler as needed (Tr. 227). The doctor performed an examination, noting that the plaintiff's systems were clear and normal, but her nose contained thick green pus. The physician also discussed a computerized tomography ("CT") scan of the plaintiff's sinuses (from October 2001) that was compatible with chronic sinusitis and a left maxillary mucous retention cyst (Tr. 228). Additionally, Dr. Kim noted

---

[3] The relevant period runs from the plaintiff's alleged onset date of December 31, 2002, through December 31, 2006, the plaintiff's date last insured (Tr. 12).

[4] "Sarcoidosis is an inflammatory disease that affects one or more organs but most commonly affects the lungs and lymph glands. As a result of the inflammation, abnormal lumps or nodules (called granulomas) form in one or more organs of the body. These granulomas may change the normal structure and possibly the function of the affected organ(s). http://my.clevelandclinic.org/health/diseases_conditions/hic_Overview_of_Sarcoidosis

that the plaintiff had undergone allergy testing that showed positive reactions to molds, epidermals, and certain foods. The doctor diagnosed acute purulent sinusitis, chronic sinusitis, allergic rhinitis, and headaches ("probably secondary to allergies") (*id.*). Dr. Kim prescribed, *inter alia*, an antibiotic, a moisturizing nasal spray, and an antihistamine. He also advised the plaintiff to avoid dust and mold, animals in the home, and caffeinated and carbonated drinks, and to increase her water and juice consumption and rotate foods that produce a marked allergic response (Tr. 229).

Susan Robinson, M.D., treated the plaintiff on September 10, 2002, for a sinus infection with thick, yellow discharge that reportedly began two weeks earlier, as well as headaches, and facial pain (Tr. 733).

On January 23, 2003, the plaintiff was evaluated by G. O. Hitchcock, M.D., for complaints of allergies and swollen eyes. The doctor prescribed an antihistamine (Tr. 730).

On March 12, 2003, the plaintiff sought a referral to a dermatologist to treat her facial breakouts that were caused by sarcoidosis (Tr. 728-29).

On May 6, 2003, the plaintiff complained of "bad" allergic symptoms, but denied asthma or wheezing (Tr. 726-27). The physician observed that the plaintiff had bags under her eyes and noted her symptoms of sneezing and sinus pressure. On examination, the plaintiff's lungs were clear, and her nasal muscosa was "boggy" (*id.*). On December 15, 2003, the plaintiff complained of allergies; itchy, watery eyes; nasal pressure; hoarseness; occasional wheezing; and a sarcoid lesion on her face that had gotten worse. The plaintiff denied chills, fever, body aches, nausea, vomiting, and diarrhea (Tr. 723). At a follow-up appointment on January 15, 2004, the plaintiff complained of itchy, watery eyes, sneezing, runny nose, fever, vomiting, body aches, and dermatitis (Tr. 718-19).

On February 21, 2003, the plaintiff was evaluated by Andreas H. Schoppe, M.D., for repeated nasal infections (Tr. 725). Dr. Schoppe prescribed a nasal spray and

6

advised the plaintiff that if her problem continued, she might consider nose-conchae-coagulation surgery (Tr. 725).

The plaintiff's sinus infections were next treated on January 28, 2004.  The physician noted the plaintiff's history of sinus infections, and indicated that the plaintiff was treated with antibiotics, but the infection had returned once the antibiotics stopped.  The doctor also noted the plaintiff's complaints of sinus pressure, congestion, drainage, and cough, but stated, "sarcoid doing well [and] no problem currently [with] asthma" (Tr. 715). On February 23, 2004, the plaintiff returned complaining of a sore throat and ear pain.  The doctor noted that the plaintiff's lungs were clear on examination.  The doctor added a new medication to the plaintiff's regimen (Tr. 714).

A chest x-ray dated February 23, 2004, showed a "slight decrease" in lesions and biapical densities, but "no acute pulmonary infiltrations or other abnormality seen" (Tr. 712).  On March 10, 2004, the plaintiff was seen for follow-up after the x-ray.  The plaintiff reported that she was very congested and that her allergy medication was not working.  The doctor ordered a refill of prednisone and advised her to follow up with an internist (Tr. 713).

On August 13, 2004, the plaintiff complained of headaches to Harminder Singh, M.D., who noted the plaintiff's additional complaints of nasal congestion, sinus pain, and nausea (Tr. 707).  Dr. Singh diagnosed a possible sinus infection and noted that allergy medications were reportedly not working (Tr. 708).

On February 9, 2005, the plaintiff was treated for complaints of cough and allergy-like symptoms.  The plaintiff reported that her last follow-up with an internist was six months prior.  The examining source noted that the plaintiff was ambulatory with no distress or wheezing.  Her ears and nose were "clear" (Tr. 704, 830).

On March 10, 2005, the plaintiff was treated by Charles Hamilton, M.D., for sinus problems, wheezing, and nose bleeds.  She told the doctor that she had been congested with a cough for ten days but that she had no pain (*id.*).  The physician observed

7

that the plaintiff appeared healthy, was not in acute distress, did not appear to be chronically ill, and did not appear uncomfortable (Tr. 836). Dr. Hamilton diagnosed allergic rhinitis (Tr. 837).

On May 19, 2005, the plaintiff was treated by William Reynolds, O.D., an optometrist (Tr. 699-700). She reported an eye discharge and a history of sinus surgery, as well as watery eyes. Dr. Reynolds noted that the plaintiff had 20/20 vision in both eyes and that her eyelids had flaky skin. He also observed a purulent discharge, but indicated that no redness or edema were present (Tr. 699). The plaintiff saw Dr. Reynolds again on May 31, 2005. The doctor indicated that the plaintiff's dacryocystitis and meibomitis[5] were improving (Tr. 698). On June 14, 2005, the plaintiff told Dr. Reynolds that she had a decreased discharge but had itchy and irritated eyes. She reported good medication compliance and was using Maxitrol for the flaky skin on her eyelids. The optometrist diagnosed a disorder of the larcrimal system, noting that the dacryocystitis was resolved and the meibomitis was improving (Tr. 697).

On August 14, 2005, the plaintiff was seen by Carolyn M. Comer, M.D., for an ear ache (Tr. 874-75). The plaintiff told the doctor that she had a history of anemia and had previously taken an iron supplement. The plaintiff reported that she did not have asthma and was not using Advair on the advice of her pulmonologist (Tr. 874). Dr. Comer diagnosed Eustachian tube dysfunction, allergic rhinitis, sarcoidosis with lung involvement, and anemia (Tr. 875).

On November 4, 2005, the plaintiff was seen by Dr. Hamilton for an allergist referral. The plaintiff told the doctor she felt "fine," had no illness since her last visit, no

---

[5] "Dacryocystitis is infection of the lacrimal sac, usually with staphloccal or streptococcal species and usually as a consequence of nasolacrimal duct obstruction." *The Merck Manual of Diagnosis and Therapy* (19th ed. 2011). Meibomitis is a condition characterized by inflammation of the meibomian glands. *Taber's Cyclopedic Medical Dictionary* (22nd ed. 2013).

snoring, nasal lump or mass, or sore throat.   She reportedly experienced occasional wheezing but had no shortness of breath and had not used Advair since March 2005 (Tr. 843-44).

On December 13, 2005, the plaintiff was evaluated by Lawrence S. Weiner, M.D., of the Carolina Allergy & Asthma Consultants (Tr. 235-41).   The plaintiff reported hoarseness and cough (Tr. 235).   The doctor observed that the plaintiff's eyes were puffy, her nose was blue and swollen, there was an obstruction on the left side of her nose, and she wheezed (*id.*).

An x-ray of the plaintiff's chest, dated December 28, 2005, showed diffuse pulmonary sarcoidosis without evidence of adenopathy (Tr. 531).

On January 3, 2006, the plaintiff was evaluated by Dr. Weiner (Tr. 233-34). She reported hoarseness and cough, and told the doctor about her history of sarcoidosis in her lungs and skin.   Dr. Weiner observed swollen, blue, pale nasal turbinates with obstruction in the right nostril greater than the left, as well as sniffing and coughing with a clear nasal drainage.   The plaintiff's pulmonary functioning scores, FVC and FEV1, were 74% and 79% of predicted, respectively, with no change after the bronchodilator.   The doctor diagnosed allergic rhinitis, reversible obstructive airway disease, and possible chronic sinusitis (Tr. 233)*.*

A treatment history report dated January 13, 2006, includes a notation that the plaintiff's sarcoidosis of the skin and lungs has "been stable and in remission for the last [seven] years" (Tr. 561).  The note also indicated that the plaintiff used Albuterol and Advair for bronchospasm and received oral prednisone three to four times per year for symptoms of fatigue and persistent cough (*id.*).   The plaintiff's sarcoid severity level was rated as "moderate," and her asthma was described as "persistent" (Tr. 562.

9

On February 21, 2006, the plaintiff was treated at the MACH Family Health Center for a possible eye infection (Tr. 859-60).  She reported eye pain lasting three days, with redness and draining.  The physician diagnosed conjunctivitis (Tr. 860).

On March 13, 2006, the plaintiff had a follow-up appointment with her allergist, Dr. Hamilton (Tr. 864-65).  The doctor noted that the plaintiff had been well since her last visit, appeared healthy, was not chronically or acutely ill, and did not appear uncomfortable (Tr. 865).

On March 29, 2006, the plaintiff was treated by David F. McKee, M.D., for sinusitis.  Dr. McKee noted a "mild" nasal passage blockage and thick, post-nasal discharge.  He diagnosed allergic rhinitis (Tr. 868-69).

On March 31, 2006, the plaintiff was evaluated by Dr. Hamilton for allergies (Tr. 870-72).  The plaintiff's examination was unremarkable, apart from a notation of nasal congestion.  Dr. Hamilton diagnosed allergic rhinitis and advised the plaintiff to continue using an antihistamine (Tr. 871).

On April 20, 2006, the plaintiff was evaluated by Paul M. Kirschenfeld, M.D. (Tr. 821-28).  Dr. Kirschenfeld noted that the plaintiff complained of shortness of breath "only occasionally but is able to perform normal activities without problems."  He also noted that she denied chronic cough, but had experienced hoarseness over the past three years that her ear, nose, and throat ("ENT") specialist did not believe was serious (Tr. 821).  On examination, the plaintiff's lungs revealed "a few crackles" but no wheezes.  The doctor's impression was that the plaintiff's sarcoidosis was "symptomatically stable," and there was "no concrete evidence of asthma" (Tr. 822).

On September 22, 2006, Dr. Comer noted that the plaintiff's platelets "were a little high" and that an iron panel showed low iron saturation, but the rest was normal (Tr. 879).  On October 9, 2006, Dr. Comer wrote, "I don't think it is iron deficiency anemia" and indicated she would seek a consultation for further evaluation (Tr. 881).

On October 23, 2006, the plaintiff was evaluated for swollen, itchy eyes (Tr. 884-85). Dr. Hamilton diagnosed acute, allergic conjunctivitis and prescribed eye medication (Tr. 885). On November 16, 2006, the plaintiff was treated again by Dr. Hamilton for an eye infection (Tr. 886-87). Dr. Hamilton referred the plaintiff to an ophthalmology clinic (Tr. 887). Darrell L. Witt, D.O., evaluated the plaintiff the same day (Tr. 888-89). He diagnosed a marginal corneal ulcer and prescribed an eye medication (Tr. 889). On November 17, 2006, the plaintiff's eye was examined by Larry K. Andreo, D.O. Dr. Andreo noted no change in the ulcer (Tr. 890-91). On November 20, 2006, Dr. Andreo noted an improvement in the plaintiff's eye condition and indicated that she was "released without limitations" (Tr. 893-94). On November 21, 2006, Dr. Witt reported that the size of the plaintiff's eye ulcer had decreased (Tr. 895-96). On December 4, 2006, Dr. Andreo stated that the plaintiff's corneal ulcer was "almost healed" (Tr. 904). The ulcer had reportedly "resolved" on December 28, 2006 (Tr. 912).

On November 9, 2006, the plaintiff was referred to Steve A. Madden, M.D., for evaluation of anemia (Tr. 915-16). On January 9, 2007, Dr. Madden indicated that the plaintiff's persistent anemia with thrombocytosis "has essentially improved" and that the plaintiff was not taking her iron supplement on a regular basis (Tr. 918).

### *Medical Opinion Evidence*

On May 21, 2010, Robert G. Haas, M.D., evaluated the plaintiff's medical evidence and determined that, although the plaintiff was diagnosed with and treated for sarcoidosis of the skin and lungs, "there is not enough information documented to be able to rate [the plaintiff's limitations] from [the plaintiff's alleged date of onset] of [December 31, 2002] until the [date last insured of December 31, 2006]." He continued, "In those records, there is not enough documentation of functional limitations and exams not detailed enough to be able to accurately rate prior to the [date last insured]." He concluded, the plaintiff's "[c]laim is insufficient to rate prior to [date last insured]" (Tr. 770).

11

**ANALYSIS**

The plaintiff was born on January 17, 1966, and she was 36 years old on her alleged disability onset date (December 31, 2002). She was 40 years old on the date she was last insured (December 31, 2006). She completed two years of technical college studying business administration (Tr. 31). The plaintiff has past relevant work as a secretary, cashier supervisor, inventory/invoice control worker, sales associate, customer service clerk, and store manager. The plaintiff states in her brief that she is "requesting reconsideration" of the ALJ's decision, because she "believe[s] the evidence is there" (pl. brief at p. 2).

At step three of the sequential evaluation process, the ALJ found that the plaintiff's sarcoidosis did not meet or equal Listing 3.02 (chronic pulmonary insufficiency) and that her asthmatic bronchitis did not meet or equal Listing 3.03 (asthma) (Tr. 13). Substantial evidence supports these findings. Listing 3.02 requires a claimant to meet either the A-, B-, or C-criteria. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02. To meet the A-criteria, a claimant's chronic obstructive pulmonary disease (due to any cause) must result in a forced expiratory value after one second ("FEV1") equal to or less than the valued specified in Table I, which lists values based on a claimant's height without shoes. *Id*. The record reflects that, during the relevant period, the plaintiff's FEV1 value was equal to 1.97L and 2.46L– both values exceed every measurement on the table regardless of the claimant's height (Tr. 237). *Id.* § 3.02(A), Table I. Thus, the plaintiff's condition did not meet or equal Listing 3.02 under the A-criteria.

The B-criteria require a chronic restrictive ventilator disease (due to any cause) with a forced vital capacity ("FVC") equal to or less than the values specified in Table II, which lists values that correspond to a claimant's height without shoes. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02(B). Again, the record shows that, during the relevant period, the plaintiff's FVC value equaled 2.17L and 2.91L – values that exceed the table

measurements regardless of height (Tr. 237). *Id.* § 3.02(B), Table II.  Accordingly, the plaintiff's condition did not meet or equal Listing 3.02 under the B-criteria.

The C-criteria require single breath diffusing capacity of the lungs for carbon monoxide ("DLCO") values to be less than 10.5 mL/min/mm Hg or less than 40 percent of the predicted normal value. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02(C)(1).  In this case, the plaintiff's values exceeded that threshold value, measuring 14.9, 28.9, and 51 in April 2006 (Tr. 825). *Id.*  The record contains no scores that correspond to the arterial blood gas requirements under section 2 of the C-criteria under Listing 3.02. *See id.* § 3.02(C)(2). Based upon the foregoing, the plaintiff has not shown that she meets or equals Listing 3.02 under the A-, B-, or C-criteria.

To meet or equal Listing 3.03(A) (asthma with chronic asthmatic bronchitis), a claimant must satisfy the requirements under Listing 3.02(A). 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.03(A). As discussed above, the evidence does not show that the listing is met or equaled.  Listing 3.03(B) requires asthma attacks in spite of required treatment and requiring physician intervention at least once every two months or at least six times a year. *Id.* § 3.03(B).  As found by the ALJ, the plaintiff also did not meet or medically equal this listing (Tr. 13).

Based upon the foregoing, the undersigned finds no error in the ALJ's findings at step three of the sequential evaluation process.

The undersigned further finds that the ALJ's residual functional capacity ("RFC") finding is supported by substantial evidence.  An RFC assessment describes the most an individual can still do despite her physical and/or mental impairments. 20 C.F.R. § 404.1545(a)(1).  In assessing a claimant's RFC, an ALJ considers "all of the relevant medical and other evidence," including "statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations." *Id.* § 404.1545(a)(3).

In this case, the ALJ found that the plaintiff had the RFC to perform light work (with lifting or carrying of no more than ten pounds frequently and twenty pounds occasionally), that requires no more than occasional stooping, crouching, kneeling, crawling, balancing, and/or climbing stairs or ramps.  The ALJ also found that the plaintiff could never climb ladders, ropes, or scaffolds and that, due to her respiratory impairments, she must not have concentrated exposure to dust, fumes, gases, odors, mold, or extremes of humidity or temperature (Tr. 13).

The ALJ's RFC finding is supported by substantial evidence, including treatment notes showing mild, treatable conditions; the plaintiff's own admitted activities of daily living during the relevant period; and a lack of medical opinions that the plaintiff's conditions imposed any work-related limitations. Prior to the plaintiff's date last insured – December 31, 2006 – the medical treatment notes show that she was being treated primarily for sinusitis and symptoms associated with allergies, but also for a facial skin rash due to sarcoidosis, chronic eye infections, and anemia (*see, e.g.*, Tr. 697-700, 723, 728-30, 859-60, 884-912, 915-18).  The notes suggest that these conditions were stable or treatable and that only the allergies imposed work-related limitations.  For example, with respect to the plaintiff's lungs, the notes reflect that the plaintiff's sarcoidosis was "stable" and that her lungs were described as either "clear" or, on occasion, exhibiting a mild wheeze (*see, e.g.*, Tr. 561, 714, 726-27, 739, 228).  A note dated January 13, 2006, states that the plaintiff's sarcoidosis of the skin and lungs has "been stable and in remission for the last [seven] years" (Tr. 561).  Additionally, a chest x-ray from February 2004 showed a "slight decrease" in lesions and biapical densities, but otherwise, "no acute pulmonary infiltrations or other abnormality [was] seen" (Tr. 712).

With respect to work-related limitations, in April 2006, Dr. Kirschenfeld noted that the plaintiff complained of shortness of breath "only occasionally but is able to perform normal activities without problems" (Tr. 821).  In accordance with Dr. Kirschenfeld's report,

the ALJ found the plaintiff capable of light-exertion work (Tr. 13).  The plaintiff's skin rashes, which were also caused by sarcoidosis, appeared to be treatable and imposed no discernible work-related limitations.  During the relevant period, the plaintiff complained of sarcoid skin "breakouts" in March 2003 and December 2003 (Tr. 723, 728-29).  One physician noted that the plaintiff had been treated in the past with a cream and Selsen, but that the skin condition had worsened – necessitating referral to a dermatologist (Tr. 728). There is no suggestion in the record, however, that the plaintiff's occasional facial rashes imposed work-related limitations.

The plaintiff was also treated on numerous occasions for sinusitis and allergic rhinitis, which included symptoms of congestion, watery and itchy eyes, and sneezing *(see, e.g.*, Tr. 726-27).  She  was prescribed antihistamines and nasal moisturizing sprays and was advised to avoid dust and mold, animals in the home, and caffeinated and carbonated drinks (Tr. 229). In accordance with that medical advice, the ALJ limited the plaintiff to work that involved no concentrated exposure to dust, fumes, gases, odors, mold, or extremes of humidity or temperature (Tr. 13).

The plaintiff was also treated for an eye infection in February 2006 and a second infection involving a corneal ulcer in November 2006 (Tr. 859-60, 887-912). The notes show that the corneal ulcer had resolved by December 2006 (Tr. 912). As argued by the Commissioner, there is no indication that either infection imposed any work-related limitations. On November 20, 2006, Dr. Andreo noted an improvement in the plaintiff's eye condition and stated that she was "released without limitations" (Tr. 893-94).

The notes also show that the plaintiff was referred to Dr. Madden in November 2006 for evaluation and treatment of anemia, but that by January 2007, the plaintiff's persistent anemia had "essentially improved" (Tr. 915-18). Dr. Madden also noted that the plaintiff was not taking her iron supplement on a regular basis (*id.*).  Nothing in the record suggests that the plaintiff's anemia imposed work-related limitations.

The ALJ's RFC assessment is also consistent with the plaintiff's activities of daily living during the relevant period (*see* Tr. 14).   The plaintiff testified that she dressed and bathed on her own, but required assistance when she experienced muscle soreness due to prednisone use (Tr. 33-34). She also reported that, prior to her date last insured, she prepared meals for herself and her family, shopped for groceries, washed laundry, and washed dishes (Tr. 34-35; *see* Tr. 14). These activities are consistent with the ALJ's RFC finding.

Moreover, apart from Dr. Kim's advice that the plaintiff should avoid allergic triggers (Tr. 229), which was incorporated in to the RFC assessment (Tr. 13, 16), the record contains no medical opinion that the plaintiff possessed any work-related limitations during the relevant period (Tr. 15).   In her reply brief, the plaintiff appears to argue that the ALJ erred by not ordering a physical consultative examination (doc. 35 at p. 2 ("I never understood why I was never sent to one of their doctors to see if they did not see what they wanted to see or why was I not given an exam by one of their doctors.")).   The regulations provide that "[i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests."   20 C.F.R. § 404.1517. Situations that may require a consultative examination are when one is needed "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."   *Id.* § 404.1519a(b).   Furthermore, "the ALJ has discretion in deciding whether to order a consultative examination."   *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003).   State agency medical consultant Dr. Haas evaluated the medical evidence on May 21, 2010, and determined that, although the plaintiff was diagnosed with and treated for sarcoidosis of the skin and lungs, "there is not enough information documented to be able to rate [the plaintiff's limitations] from [the plaintiff's alleged date of onset] of [December 31, 2002] until the [date last insured of

6:13-cv-01078-RMG    Date Filed 10/27/14    Entry Number 38    Page 17 of 20

December 31, 2006]" (Tr. 770). The ALJ acknowledged this opinion and noted that Dr. Haas did not have the hearing testimony for review, and thus his opinion was not based on the whole record (Tr. 16). The ALJ found that the medical evidence and the lack of treating source findings or objective medical evidence documenting or supporting significant work related limitations supported his RFC assessment (*id.*).

In *Cook v. Heckler*, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." 783 F.2d 1168, 1173 (4th Cir.1986). The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." *Id.* However, it is a claimant's responsibility to prove to the Commissioner that he or she is disabled. 20 C.F.R. § 404.1512(a). "Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel." *Lichlyter v. Astrue*, 2012 WL 4442521 (S.D.W.Va. May 22, 2012) (citation omitted). Here, the ALJ held the record open after the hearing for additional evidence to be submitted by the plaintiff's attorney. Noting a gap in the records of the plaintiff's treatment during the last 24 months of the relevant time period, the ALJ requested the following of the plaintiff's attorney at the hearing:

> When you leave here today, I want you to dig back in the records from Moncrief Army Community Hospital, and I want you to flag for me and put in writing to me a brief summarizing the treatment that Ms. James had, particularly in those two years, 2005 and 2006, the last 25 months prior to date last insured. . . . . Now, here's the situation. You realize we have to be able to establish a severe impairment that's going to last longer than 12 months. That's the reason I'm looking at a 24 month window… Because if it didn't show up in that 24 month window, at this point, there's not a dat blame thing I can [do] to help her prior to that and there's not anything I can do to help her now. So I'm going to ask you two ladies to put your heads together when you leave. If you need to request updated records, do so. If you have all of the records, go through them and give me basically I'm looking for a three or four page chronological summary showing the inability to work

17

> documenting conditions that are severe enough that the
> individual would not be able to work, because that's what I don't
> have right now.

(Tr. 54; *see* Tr. 49-53).  The plaintiff's attorney submitted the requested chronology and

medical records on May 18, 2011, and again on June 8, 2011 (Tr. 169-76), and the records

were considered by the ALJ (Tr.16; *see* Tr. 21-22).   The undersigned finds that the ALJ

complied with his duty to develop the record for the pertinent time period, and he did not

err in not ordering a physical consultative examination.

At step four of the sequential evaluation, the ALJ must compare the plaintiff's

RFC assessment to the mental and physical demands of the plaintiff's past relevant work

to determine if she is still capable of performing that work. 20 C.F.R. § 404.1520(f). If the

claimant can perform her past relevant work, the ALJ will find her not disabled at this step.

*Id*. Here, the ALJ found the plaintiff not disabled at this step, and that finding is supported

by substantial evidence. Social Security Ruling ("SSR") 82-62 discusses what is required

for an ALJ to find a claimant capable of performing past relevant work:

> In finding that an individual has the capacity to perform a past
> relevant job, the determination or decision must contain among
> the findings the following specific findings of fact:
>
> 1. A finding of fact as to the individual's RFC;
>
> 2. A finding of fact as to the physical and mental demands of
> the past job/occupation; and
>
> 3. A finding of fact that the individual's RFC would permit a
> return to his or her past job or occupation.

1982 WL 31386, at *4.

Here, the ALJ made a specific finding about the plaintiff's RFC (Tr. 13), and

he then relied on vocational expert testimony in making the remaining required findings (Tr.

17). Based on a detailed discussion at the hearing about the plaintiff's RFC and the mental

18

and physical requirements of each of her past relevant jobs, the ALJ stated as follows in the decision:

> The vocational expert was asked in Hypothetical #2 to consider an individual of the claimant's age, education, and work experience with limitations as noted above at finding 5. In response to questioning as to whether such an individual could perform any of the claimant's past relevant work, the vocational expert testified that given all of these factors the individual would have been able to perform the secretarial position, the supervisor of cashiers position, the inventory/invoice control worker position, the general sales associate position as described within the [*Dictionary of Occupational Titles* ("*DOT*")] with light exertional parameters and as the claimant performed it, as a customer service clerk as described within the DOT with light exertional parameters and as the claimant performed it, and as a store manager as described within the DOT with light exertional parameters, but not as actually performed.
>
> In light of the vocational expert testimony, comparing the claimant's residual functional capacity with the physical and mental demands of the work the [vocational expert] testified she could have still performed with the above residual functional capacity during the period in question, I find that the claimant was able to perform these jobs as actually and generally performed with the exception of the store manager position, which she could have performed as generally performed in the national economy within light exertional parameters but not as actually performed.

(*Id.*). The undersigned finds no error in the ALJ's analysis of the plaintiff's ability to perform her past relevant work.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

October 27, 2014
Greenville, South Carolina

19

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).